Filed 11/2/16

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PAUL CAMERON, | C077823 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201380001519CUWMGDS) |
| v. | |
| SACRAMENTO COUNTY EMPLOYEES' RETIREMENT SYSTEM, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Affirmed.

Ronald Metzinger for Plaintiff and Appellant.

Diana L. Ruiz for Defendant and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.B. of the Discussion.

1

Plaintiff and appellant Paul Cameron appeals from the trial court's judgment denying his petition for a writ of administrative mandate challenging the Sacramento County Employees' Retirement System Board's (SCERS) decision to reject his application seeking a service-connected disability retirement.

Plaintiff submitted his application for disability retirement on May 22, 2009, after the second of two injuries he sustained during his tenure as a Sacramento County employee. The SCERS staff referred this matter to the Office of Administrative Hearings where it was heard by Administrative Law Judge (ALJ) Catherine B. Frink. On February 6, 2013, the ALJ found that the application was untimely and denied the application for service-related retirement. Based on the ALJ's findings, SCERS denied plaintiff's application for service-connected retirement.

Plaintiff then filed a petition for writ of administrative mandate challenging the board's decision. The trial court denied plaintiff's petition. On appeal, plaintiff contends that the trial court erred in denying his application for service-connected disability retirement.

In the published portion of this opinion, we conclude that plaintiff failed to show he was continuously disabled within the meaning of Government Code sections 31722 and 31641, subdivision (a),[1] between the discontinuance of his service and the time he filed his application for service-connected disability retirement. Consequently, his application was not timely under section 31722.

In the unpublished portion of this opinion, we conclude that plaintiff has not shown that SCERS failed to inform him of his rights regarding disability retirement, misled him concerning those rights, otherwise breached its fiduciary duty to him, or caused plaintiff's delay in making his application.

---

[1] Undesignated statutory references are to the Government Code in effect at the time of the proceedings.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Plaintiff's Employment and Disability History

Plaintiff began employment for Sacramento County (the County) as an automotive service worker on December 3, 2001. His employment with the County automatically qualified him as a miscellaneous tier III member of SCERS. He is credited for working just over six years for the County, and at the time of his disability retirement request, he was classified as a range A, auto mechanic. Plaintiff's duties required him to perform repairs and install light bars and other added equipment to "'build up'" law enforcement vehicles. He was required to lift up to 75 pounds.

During his time working for the County, plaintiff was injured twice. The first injury was on September 16, 2004, where he sustained a neck injury. After this accident, plaintiff returned to work after taking 10 days of temporary disability to recover. The second injury occurred on July 6, 2005, where plaintiff sought treatment for headache, neck pain, and left arm numbness. He then spent five weeks recovering from that injury before returning to his full-time duties.

Throughout 2007, plaintiff met with medical professionals after he applied for workers' compensation benefits. On March 1, 2007, Dr. Edward M. Tapper, an orthopedic surgeon, examined plaintiff. Based on an MRI, Dr. Tapper diagnosed plaintiff with "a herniated disc at C6-7." In his initial report dated April 16, 2007, Dr. Tapper noted that plaintiff was at that time doing his regular job and did not appear to be a qualified injured worker for workers' compensation purposes. In a report dated July 26, 2007, Dr. Tapper opined that plaintiff had a 15 percent permanent impairment related to his cervical disc herniation and a possible three percent whole person impairment related to myofascial pain syndrome.

On April 4, 2007, Dr. Beth Bathgate, an orthopedic surgeon, examined plaintiff and issued a report two months later. She also diagnosed plaintiff with a herniated disc at

3

C6-7.  She concluded that plaintiff was "permanent and stationary" for workers'

compensation purposes, noting that he had returned to work after sustaining both injuries.

Dr. Bathgate's judgment was that plaintiff had 18 percent impairment of the whole

person as a result of his cervical disc injury.  She stated that plaintiff could continue full-

time work as tolerated but also noted that plaintiff had "work preclusions from Repetitive

Neck Flexion and Extension and Heavy Lifting."

Plaintiff continued his full-time employment as an automotive mechanic for the

County until December 7, 2007.  On December 8, 2007, he was arrested for discharging a

firearm in a grossly negligent manner during a non-work related incident.  As a result, his

required security clearance was suspended pending reassessment by the County.

Effective December 10, 2007, he was placed on administrative leave, pending the

County's investigation.

Part of the County's investigation required plaintiff to receive a psychological

evaluation by Mark Kimmel, Ph.D.  Dr. Kimmel saw plaintiff on January 2, 2008.  Dr.

Kimmel concluded that plaintiff was not fit for duty and that he was "'potentially a

danger to others based on his recurrent and poorly controlled mood states, coupled with

poor impulse control and reactivity.'"  Dr. Kimmel recommended plaintiff be evaluated

by a psychiatrist and take anger management and stress management courses.  As a result

of Dr. Kimmel's findings, plaintiff was removed from administrative leave and placed on

medical leave effective January 23, 2008.

Plaintiff exhausted his leave balances and was on unpaid leave effective February

5, 2008.  On April 24, 2008, plaintiff exhausted his Family Medical Leave Act and

California Family Rights Act (FMLA/CFRA) entitlement.[2]

---

[2]  During oral argument, plaintiff's counsel reiterated his contention in the opening brief
that plaintiff "remained off of work under FMLA through March of 2009."  Counsel
argued that there are no cases addressing the timeliness of an application for disability

4

Plaintiff was reevaluated by Dr. Kimmel on May 14, 2008, and was found fit to return to work. Plaintiff received vacation pay and sick leave pay during the same week, which was compensation to which he was entitled for attending the May 14 medical evaluation. This was the last compensation plaintiff received from the County. It was paid on May 15, 2008.

On June 16, 2008, plaintiff's security clearance was reinstated. However, plaintiff did not return to work.

Between October 28, 2008, and November 25, 2008, the County had a company monitor and video record plaintiff performing his day-to-day activities. These activities included bending down to fix his sprinklers and also lifting objects.

Plaintiff submitted a note to the County dated November 12, 2008, from his personal physician, Dr. Paul Seites. Dr. Seites wrote that plaintiff was not able to work from June 16, 2008, to September 29, 2008.[3]

On January 14, 2009, plaintiff saw another physician, Dr. Mark King, who reviewed plaintiff's condition. In his report, Dr. King described his findings as: "Mild degenerative changes of the mid-to-lower cervical spine from C3 through C7 . . . with osteophytes." He did not opine that plaintiff was at anytime substantially incapacitated from the performance of his duties.

On March 11, 2009, Lori Kleczka, a personnel analyst employed by the County, sent plaintiff a letter outlining his leave history. The letter referenced a letter from Dr. Seites indicating that plaintiff needed to be off work through February 2, 2010. The letter

retirement when the application is made while the employee is still on FMLA. However, plaintiff cited nothing in the record in either his brief or during oral argument to support the assertion that he was on FMLA leave through March of 2009. Indeed, his assertion is belied by the ALJ's factual finding that plaintiff's FMLA leave was exhausted as of April 24, 2008, as well as the admission in plaintiff's opening brief that "[a]s of April 28, 2008 he had exhausted FMLA and CFRA rights and entitlements."

[3] The record is not clear as to the date the letter was submitted.

also referenced a plaintiff's failure to respond to a "Reasonable Accommodation Request form" she sent to him on December 26, 2008, and went on to explain that due to business necessity, the County could not approve any more leave. The letter discussed three options. He could voluntarily resign, which would allow him to request reinstatement up to three years. He could submit an application for retirement and the letter advised him to contact SCERS to discuss his retirement options. Lastly, he could return to work if he could produce a medical release. The letter explained that if he did not exercise one of those options by March 26, 2009, he would be considered absent without leave and subject to disciplinary action or termination.

On April 22, 2009, plaintiff signed his application for service-connected disability retirement. The application was submitted to SCERS on May 22, 2009, and was deemed completed by SCERS on June 24, 2009.

Plaintiff claimed he was permanently incapacitated because of neck pain and cervical disease described as "'MRI neck C4, C5, C6 and C7 vertebrae of neck.'" He listed the 2005 injury as the basis for his service-connected disability request. Plaintiff's application stated that he was unable to perform the necessary actions of his job, including "'lifting, cannot refurbish cage, put on car,'" etc. In the portion of the application inquiring which job functions plaintiff could perform, he stated, "'None for extended period of time.'"

In a letter to SCERS dated June 22, 2009, Dr. Seites, the doctor who had written in November of 2008 that plaintiff was not able to work from June 16, 2008, to September 29, 2008, now stated plaintiff "has been continuously disabled from 6/16/2008." Dr. Seites stated that he had been following plaintiff since 2003, and when plaintiff sustained the neck and back injury in 2004. Dr. Seites stated that since the injury, plaintiff's pain has been increasing and "[h]e is unable to perform tasks that are more than sedentary. This is due to unrelenting intractable pain in neck radiating to arm with paresthesias and

6

numbness in hands.  He has cervical disc disease."  Dr. Seites also wrote, "The disability is permanent  [¶]  6/22/2009."

On June 24, 2009, plaintiff added a letter to his application stating, "'I Paul Cameron have decided to pursue Service-Connected Disability solely based On [*sic*] my neck injury only which [h]as caused cervical disc disease.'"

On September 16, 2009, SCERS disability specialist Bill Schnathorst sent a letter to plaintiff, stating, "This is to confirm that you met the filing requirements for disability retirement effective June 24, 2009, and the investigation process has begun."  The letter further stated that plaintiff had the "burden of producing evidence to support" his application by a "preponderance of the evidence."  (Boldface & underscoring omitted.)

On August 2, 2010, Mr. Schnathorst sent an e-mail to plaintiff's wife, Patty Cameron, in part saying, "[Y]our husband met the filing requirements for disability retirement."  Schnathorst apologized for the delay.

At the request of SCERS in 2011, Dr. Robert Henrichsen, an orthopedic surgeon, evaluated plaintiff.[4]  Dr. Henrichsen reviewed plaintiff's medical history and records, and performed a physical examination of plaintiff.  In a report dated January 19, 2011, Dr. Henrichsen's stated diagnostic impressions included degenerative disc disease to the cervical spine, symptoms of referred pain to his left upper extremity, and physical deconditioning.  He opined that plaintiff "does have permanent disability relevant to his cervical spine."  Dr. Henrichsen's report stated, "'[Plaintiff's] permanent limitations occurred when he went off work *which, to my understanding, was 2007.  From 2004 to 2007 he continued his employment.*'"  (Italics added.)

_____

[4]  The county retirement board, here SCERS, "may require such proof, including a medical examination at the expense of the member, as it deems necessary or the board upon its own motion may order a medical examination to determine the existence of the disability."  (§ 31723.)

When plaintiff testified during the administrative hearing, he claimed he did not recall being arrested in December 2007, or being placed on administrative leave. Later, he admitted having been charged with a crime and said he had to obtain legal counsel to get his job back.

After being informed of the real reason plaintiff left work in 2007, Dr. Henrichsen testified that he could not determine at what point plaintiff became permanently incapacitated. Rather, all he could state with certainty is that plaintiff was permanently incapacitated from the performance of his job duties as of January 19, 2011, when he examined plaintiff.

On September 12, 2012, Dr. Andrew Burt, an orthopedic surgeon, examined plaintiff and reviewed his medical history. In his report, Dr. Burt discussed the medical and work history reported to him by plaintiff. Plaintiff told Dr. Burt that his neck pain increased gradually after his 2005 injury. The pain was aggravated by pushing, pulling, lifting, and positioning in the course of his work. Plaintiff reported having to take more medications with the passage of time. Based on plaintiff's self-report, Dr. Burt wrote, "Eventually, [plaintiff] could no longer tolerate the aggravation of his pain associated with the heavy physical demand of his work and he had to leave the job on 23 JAN 08." Dr. Burt added, "[Plaintiff] continues to have significant symptoms. He has not worked in any capacity since he had to leave the job on 23 JAN 08."

Dr. Burt diagnosed plaintiff with chronic discogenic neck pain, degenerative cervical disc disease, "[c]ervical disc injury/contained herniation, C6-7" and "[p]ersistent osteophyte/disc protrusion C6-7." Regarding plaintiff's ability to work, Dr. Burt opined: "The condition has rendered [plaintiff ] unable to continue working as a mechanic with a date of onset of 23 JAN 08."

**Proceedings Before the ALJ Regarding the Timeliness of the Application**

SCERS referred plaintiff's application to the Office of Administrative Hearings for an evidentiary hearing. After two days of testimony, the hearing had not yet

8

concluded. During a status conference on October 23, 2012, SCERS argued that plaintiff's application for disability retirement was late and therefore could not be processed. During a status conference on November 16, 2012, both parties agreed to allow the ALJ to make a determination of whether the application for disability retirement was timely prior to reconvening the administrative hearing. On February 6, 2013, the ALJ released her proposed decision, finding that plaintiff discontinued his service with the County on May 15, 2008, the last date he earned compensation, and because plaintiff did not file his application until May 22, 2009, the application was not timely.

In the proceedings before the ALJ, SCERS argued that the last date plaintiff had worked and had his income deducted was on December 10, 2007. The ALJ disagreed and determined that the last date he received income was on May 15, 2008; however, even that later date did not help plaintiff. In making this determination, the ALJ looked to section 31722, which sets forth alternative timing deadlines by which a service-connected disability retirement application must be filed.[5] The ALJ focused on the two alternative circumstances under which an application is timely in section 31722 that were potentially applicable in this case: "The application shall be made . . . *within four months after his or her discontinuance of service . . .*" or "*while, from the date of discontinuance of service to the time of the application, he or she is continuously physically or mentally incapacitated to perform his or her duties.*" Additionally, the ALJ looked to section

---

[5] Section 31722 provides four alternative circumstances under which an application is timely: "The application shall be made [1] while the member is in service, [2] within four months after his or her discontinuance of service, [3] within four months after the expiration of any period during which a presumption is extended beyond his or her discontinuance of service, or [4] while, from the date of discontinuance of service to the time of the application, he or she is continuously physically or mentally incapacitated to perform his or her duties." Because the alternative circumstances referenced in this case are listed third and fourth, we will refer to them as the third and fourth alternatives.

31641, subdivision (a), which defines "'service'" as "uninterrupted employment of any person appointed or elected for that period of time: [¶] For which deductions are made from his earnable compensation from the county or district for such service while he is a member of the retirement association."

The ALJ then cited *Weissman v. Los Angeles County Employees Retirement Assn.* (1989) 211 Cal.App.3d 40 (*Weissman*), which holds that "'discontinuance of service' plainly and ordinarily means a member who has ceased to work for a salary from which deductions were made." (*Id*. at p. 46.)

Relying on sections 31722 and 31641, as well as *Weissman*, the ALJ determined that plaintiff's application was not timely under the third alternative in 31722 ("The application shall be made . . . *within four months after his or her discontinuance of service*."). The ALJ found this alternative inapplicable because the last date plaintiff had funds deducted from his income was on May 15, 2008, when he was compensated for his May 14, 2008, appointment with Dr. Kimmel. Therefore, since his application was received on May 22, 2009, he did not apply during or within four months of discontinuance of service.

The ALJ found the application was not timely under the fourth alternative, which allows the application to be filed "*while, from the date of discontinuance of service to the time of the application, he or she is continuously physically or mentally incapacitated to perform his or her duties*." Dr. Seites was the only doctor who found that plaintiff had been continuously disabled, but he said the period of continuous disability began June 16, 2008. Plaintiff had argued that Dr. Bathgate's findings showed that plaintiff was continuously disabled because he could not perform any heavy lifting or do repetitive motion with his neck. This would mean plaintiff was incapacitated beginning on April 4, 2007. However, after seeing Dr. Bathgate, plaintiff returned to work for eight months and did not stop his normal duties of work until December of 2007 for reasons plaintiff claimed related to his cervical spine. Plaintiff also argued that Dr. Henrichsen had opined

10

he was permanently incapacitated. However, during the administrative hearing, it was discovered that plaintiff had not mentioned his arrest in December of 2007 to Dr. Henrichsen. When Dr. Henrichsen was informed about plaintiff's administrative leave after his arrest, he no longer could confirm that plaintiff had been incapacitated from 2007. Instead, Dr. Henrichsen stated that plaintiff was incapacitated from January 19, 2011, the date of his examination.

Lastly, plaintiff contended that the doctrine of equitable estoppel prevents SCERS from raising the issue of the timeliness of plaintiff's application. He argued that he somehow relied on the e-mail assurances of Mr. Schnathorst that plaintiff "'met the filing requirements for disability retirement effective June 24, 2009,'" and that Schnathorst was "'doing everything in [his] power to move [plaintiff's] case along.'"

The ALJ agreed with SCERS that the correspondence from Mr. Schnathorst merely confirmed that plaintiff had met the minimum filing requirements under the SCERS bylaws. The letters were not acknowledgement of the merits of the application, including its timeliness, which depended on proof of continuous incapacity.

The ALJ also noted that generally, four elements must be present in order to apply the doctrine of equitable estoppel: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305.)

The ALJ found that SCERS was not apprised of the facts regarding the issue of timeliness of the application until the administrative hearing began. While the ALJ found that Kleczka, the County personnel analyst, was so apprised, the ALJ also determined the County and SCERS are separate legal entities and knowledge of the County could not be imputed to SCERS. Further, the ALJ found plaintiff was aware of the true facts because he knew that his treating physician did not deem him to be incapacitated until June 16,

11

2008.  Because SCERS was unaware of these facts until the second day of the administrative hearing and plaintiff was aware of all the facts regarding his application and the true date he was incapacitated, the ALJ ruled SCERS was not estopped from making the untimeliness claim.[6]

SCERS relied upon the ALJ's ruling in denying plaintiff's service-connected retirement application.

### Writ of Administrative Mandate

After SCERS rejected the service-connected retirement application based on the ALJ's findings, plaintiff sought a writ of administrative mandate in Sacramento County Superior Court.  He contended that the SCERS board's decision was not supported by the evidence and that his application should have been accepted.  The trial court denied the petition.

In ruling on plaintiff's writ petition, the trial court followed the same reasoning as the ALJ.  It focused on the language in the third and fourth alternatives in section 31722, which states that the application must be submitted:  "within four months after his or her discontinuance of service," or "while, from the date of discontinuance of service to the time of the application, he or she is continuously physically or mentally incapacitated to perform his or her duties."

Regarding the third alternative in section 31722, the trial court looked to section 31641, which defines "'service'" as a period of time which deductions are made from the member's earnable compensation.  Plaintiff's last compensation related to his last fitness

---

[6] The ALJ found it unnecessary to address the other elements of equitable estoppel, including detrimental reliance.  We note, however, that plaintiff could not have relied on Schnathorst's correspondence as an excuse for his late filing because that correspondence was sent to plaintiff after he filed.  Moreover, Schnathorst's first correspondence explained that plaintiff had the burden of producing evidence to support his application and that the burden of proof was proof by a preponderance of the evidence.

for duty appointment with Dr. Kimmel on May 14, 2008. Plaintiff was thus found to have discontinued his service at the latest on May 15, 2008, the last day for which he received compensation. Because plaintiff sent the application to SCERS a year later, the application was made long after the four month limitation period in section 31722. Consequently, the court found it was not an abuse of discretion to deny him retirement with regards to discontinuance of service.

Regarding the fourth alternative in section 31722, that the application shall be accepted if "from the date of discontinuance of service to the time of the application, he or she is continuously physically or mentally incapacitated to perform his or her duties," plaintiff argued that the reports of Dr. Seites, Dr. Kimmel, Dr. Burt, Dr. King, Dr. Tapper, and Dr. Bathgate show he was continuously incapacitated since 2007. The trial court did not agree.

The trial court noted that both Dr. Bathgate and Dr. Tapper opined that plaintiff was only temporarily incapacitated. Dr. Kimmel found that plaintiff was not "'fit for duty'" for psychological reasons in January 2008 and later found he was fit to return to work in May 2008 after plaintiff attended anger management and stress classes. Dr. King offered no opinion as to whether plaintiff was substantially incapacitated from the performance of his regular duties at any time. Dr. Seites's opinion is the only opinion that found plaintiff "continuously" incapacitated for any period of time, but he fixed the beginning of plaintiff's continuous incapacitation as June 16, 2008. The court found his testimony to be unhelpful because it did not establish that plaintiff had been continuously incapacitated during the preceding month beginning on May 15, 2008, when plaintiff was last compensated. Dr. Burt's opinion was that plaintiff had a chronic condition rendering plaintiff unable to work since January 2008. However, the trial court found Dr. Burt's opinion to have been significantly undermined by the erroneous belief that plaintiff stopped working in January 2008 because of neck and arm pain related to his service connected injuries, when plaintiff had actually been placed on administrative leave for

psychological reasons. Lastly, Dr. Henrichsen could not establish incapacitation earlier than January 19, 2011.

The trial court then weighed the medical information and the surveillance video of plaintiff "'puttering around'" in his yard, playing catch with his dogs, and "'easily moving about in a normal and unfettered fashion'" and found the board did not abuse its discretion when it determined the earliest date plaintiff was incapacitated was June 16, 2008.

## DISCUSSION

### I. Standard of Review and Legal Principles Concerning the Application for Disability Retirement

Plaintiff has not contested the Board's factual findings, and factual findings not contested must be accepted as true. (*Black v. State Personnel Board* (1955) 136 Cal.App.2d 904, 909.) When a trial court considers a final administrative decision that substantially affects a fundamental vested right, the court examines the administrative record for errors of law and also exercises its independent judgment upon the evidence. (Code Civ. Proc., § 1094.5, subd. (c); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816, fn. 8.) When the trial court exercises its independent judgment, as it did here, we employ the substantial evidence test in our review. "'When the superior court has rendered its judgment on mandamus and the judgment is appealed, the power of the appellate court is governed by the substantial evidence rule, i.e., the determination of whether the evidence, viewed in the light most favorable to the respondent, sustains the findings of the trial court, resolving any reasonable doubts in favor of those findings.'" (*Harmon v. Board of Retirement* (1976) 62 Cal.App.3d 689, 691-692; accord, *Fukuda*, at p. 824.)

The retirement benefits for Sacramento county employees are generally set forth in the County Employees Retirement Law of 1937 (CERL; § 31450 et seq.). County employees may be entitled to disability retirement benefits regardless of their age if they

14

have become permanently incapacitated as a result of injury or disease substantially arising out of and in the course of their employment.  (§ 31720, subd. (a).)  The retirement board, here SCERS, is vested with the authority to grant service-related disability retirement.

When seeking disability retirement benefits, the member must file an application for disability retirement benefits.  (§ 31721, subd. (a) ["A member may be retired for disability upon the application of the member. . . . "].)  An application for disability retirement benefits must be made within the time limits set forth in section 31722.  (See fn. 6, *ante*.)

## II.  Timeliness of Plaintiff's Application

### A.  Continuous Disability

#### 1.  The Parties' Contentions

Plaintiff contends that he was continuously disabled within the meaning of section 31722 before he filed his application.  He asserts that the numerous reports from different medical professionals when viewed together prove he was disabled and not able to perform his work.  Plaintiff relies primarily on the opinion of his personal physician, Dr. Seites.  Plaintiff insists that out of all of the doctors who he had seen, Dr. Seites was the only doctor who reviewed his complete medical history and provided medical opinions regarding his disability since May 15, 2008.  Thus, plaintiff argues that Dr. Seites's determination is the most accurate and should be adopted by the court.  Additionally, plaintiff's reply brief points to the fact that Dr. Burt and Dr. Henrichsen independently came to the conclusion that plaintiff was disabled.

SCERS discounts Dr. Burt's testimony that plaintiff stopped working as of January 23, 2008, because of his neck and arm pain because plaintiff did not leave work at that time or for that reason.  SCERS also highlights that Dr. Henrichsen could only determine the date of incapacitation to be no earlier than January 19, 2011.  Therefore,

15

SCERS contends Dr. Henrichsen's opinion is not helpful to plaintiff's case because the determination was made two years after plaintiffs' application was sent to SCERS.

## 2. Analysis

As noted, an application for service-connected disability retirement is timely under section 31722 if made "while, from the date of discontinuance of service to the time of the application, he or she is continuously physically or mentally incapacitated to perform his or her duties." Plaintiff asserts his application was timely because he was continuously incapacitated from the discontinuance of his service to the time he submitted his application. Accordingly, the resolution of plaintiff's contention turns on the definition of "discontinuance of service" and whether he was continuously physically incapacitated *at all times* between the discontinuance of his service and the time he applied for disability retirement.

As the ALJ and trial court noted, the court in *Weissman, supra*, 211 Cal.App.3d 40, defined the term "'discontinuance of service'" set forth in section 31722. In *Weissman*, a county employee retired from service, but then had a heart attack about a month later. About three and one-half months after retiring, he applied for service-connected disability retirement, but the retirement board refused to accept the application because he had previously retired from service. (*Weissman*, at p. 43.) In a writ petition, the plaintiff argued that he complied with section 31722 by making the application for disability retirement within the four months allowed by that statute. (*Weissman*, at p. 43.) The trial court issued the writ, ruling that the plain language of section 31722 compelled the retirement board to accept the application. (*Weissman*, at p. 43.) In addressing the issue raised on appeal -- whether under section 31722, the retirement board was prevented from accepting a member's application for service-connected disability retirement after the member received a service pension -- the *Weissman* court interpreted the relevant statutes. In construing the term "'discontinuance of service'" in section 31722, the court wrote: "The ordinary meaning given to the word 'discontinuance' is

16

termination or cessation of activity. . . . [T]he statute defines 'service' in section 31641 as uninterrupted employment for a period of time for which deductions are made from the member's earnable compensation. It follows that 'discontinuance of service' plainly and ordinarily means a member who has ceased to work for a salary from which deductions were made." (*Weissman*, at p. 46.) Because the plaintiff applied for disability retirement within the section 31722 "four months 'grace period'" after his discontinuance of service, the retirement board was required to accept the plaintiff's application. (*Weissman*, at p. 46.)

Plaintiff here attempts to distinguish *Weissman* by arguing that the facts in that case are different from those in his case. As plaintiff notes, "we do not have an individual who had already retired and who has now asked for a disability retirement rather than a service retirement." This is true; however, that factual distinction does not affect the value of the *Weissman* court's statutory construction of section 31722 or the statutory point in time that is the date of "discontinuance of service." *Weissman*'s analysis regarding that term is directly on point and we adopt it here.

Plaintiff relies on *Dodosh v. County of Orange* (1981) 127 Cal.App.3d 936, a case that predated *Weissman*, to argue that his "service" for purposes of section 31722 continued as long as plaintiff was an employee. Specifically, plaintiff relies on language in *Dodosh* he acknowledges is dicta: "[D]iscontinued service, meaning an unpaid leave of absence during which time the person remains an employee." But as *Weissman* demonstrates and as we discuss in more detail *post*, whether the member is or is not still an employee when the application is made is not a critical factor in determining when there has been a discontinuation of service.

To put the *Dodosh* dicta in context, a brief look at that case is necessary. In *Dodosh*, a deputy sheriff took a leave of absence due to injury. When his physician notified the county he could return, he voluntarily resigned to take employment elsewhere. (*Dodosh, supra*, 127 Cal.App.3d at p. 937.) The day following his

17

resignation, the plaintiff received a refund of his retirement contributions. (*Id.* at pp. 937-938.) Nearly a year later, the plaintiff applied for disability retirement, and the retirement board determined he was no longer eligible. (*Id*. at p. 938.) His petition for writ of mandate was denied by the trial court. On appeal, the sole issue was whether the plaintiff was eligible to apply for disability retirement, and the court determined he was not because, having withdrawn his contributions, he was no longer a "member" of the county retirement system. (*Ibid*.) The *Dodosh* court noted the statutory definition of a "'member'" included a person who leaves county service, but elects to leave his or her contributions on deposit. (*Ibid*.) Because the plaintiff had withdrawn his retirement contributions after his resignation, he was no longer a member. Relying on section 31722, the plaintiff asserted he was eligible for disability retirement even though he was no longer a member. (*Dodosh*, at p. 938.) But the *Dodosh* court correctly observed that section 31722 refers to "'members'" and thus contemplates that only members can apply for disability retirement. (*Dodosh*, at p. 938.)

Having resolved the matter, the *Dodosh* court went further than it needed to go. Citing section 31641, the court said: "Additionally, 'service' means uninterrupted employment for that period of time for which deductions are made from an employee's earnable compensation [citation]. Therefore, discontinued service means an unpaid leave of absence, during which time the person remains an employee." (*Dodosh, supra*, 127 Cal.App.3d at pp. 938-939.) No statutory interpretation analysis was provided by the *Dodosh* court to support the second sentence in this quotation, the very part of *Dodosh* upon which plaintiff here relies. The *Weissman* court rejected the *Dodosh* dicta when it determined that the plaintiff in that case was still eligible to apply even though he had retired. (*Weissman, supra*, 211 Cal.App.3d at pp. 45-46.) Like the court in *Weissman*, we too reject the *Dodosh* dicta. The Legislature has defined "discontinuance of service" to refer to the period of time during which "a member who has ceased to work for a

18

salary from which deductions were made." (*Weissman*, at p. 46.) It is this legislative definition we must apply.

Plaintiff contends he was still an employee and eligible to apply as of March 2009. In support of this contention, he points to the March 11, 2009, letter he received from Lori Kleczka, the County personnel analyst, in which she provided him with three options. He argues that this shows he was still considered a county employee of the date of the letter. From this, he argues "the concept of discontinuation of service involves not only the meaning of the CERL but the County's understanding of [plaintiff]'s status such that they could advise him of his rights including the right to seek a disability retirement from his employer." But plaintiff cites no legal authority or analysis for this proposition and we are aware of none. We may properly disregard contentions perfunctorily asserted without legal development. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 (*Freeman*); *People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5 (*Carroll*); *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1396-1397 (*Bragg*); *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 482 (*Tilbury Constructors*).)

In any event, plaintiff is incorrect when he asserts the concept of discontinuation of service involves something more than "the meaning of the CERL." The meaning we must apply here is what the Legislature set forth in the CERL, and nothing more. If the Legislature wanted to define "'service'" as the period during which a person is a county employee, it could easily have done so. Instead, the Legislature defined "service" differently. As we have noted, section 31641, subdivision (a), defines "service" as "*uninterrupted employment* of any person appointed or elected *for that period of time*: [¶] (a) *For which deductions are made from his earnable compensation* from the county or district for such service while he is a member of the retirement association." (Italics added.) As can be seen by the italicized text, *employment* is just one component of the definition of "service" as it applies here. When we look to the other language we have italicized, it is clear that the period of employment is not the focus of the statute.

19

"'Service'" as defined in the CERL is the "period of time" "[f]or which deductions are made from [a member's] earnable compensation." Thus, when this period discontinues, the relevant section 31722 alternative time limitations for submitting an application for disability retirement are triggered. These alternatives do not turn on whether the member remains an employee of the county. They turn on the point in time when the member stopped being compensated for his employment and consequently, stopped making contributions to the retirement system.

Another statute confirms the difference between service and employment in the CERL. Section 31511.3, subdivision (b), describes an unpaid leave of absence. It states that an unpaid leave of absence approved by the employer shall not "be considered as *service* in calculating the retirement benefits otherwise provided under this article." (Italics added.) Thus, service and employment are not synonymous and whether the County still considered plaintiff an employee on March 11, 2009, is of no import here.

The evidence established that plaintiff ceased to work for a salary from which deductions were made when he received his last check on May 15, 2008. Consequently, that is the date of "discontinuance of service" within the meaning of section 31722. As noted, plaintiff insists that Dr. Seites is the only individual who reviewed all the medical reports and provided opinions regarding plaintiff's disability since May 15, 2008. But Dr. Seites opined that plaintiff was continuously disabled as of June 16, 2008, a month after the date of "discontinuance of service." Because Dr. Seites's opinion does not account for the period of time between May 15, 2008, and June 16, 2008, it does not establish that plaintiff was "continuously" incapacitated between the discontinuance of service and his application for disability retirement. Accordingly, the section 31722 alternative allowing an application to be made between the date of discontinuance of service to the time of the application, when the member has been continuously physically or mentally incapacitated to perform his or her duties during that time period, does not apply here to make plaintiff's application timely.

20

In an apparent effort to expand the period of continuing disability, Plaintiff points to Dr. Burt and Dr. Henrichsen, who came to the conclusion that plaintiff was disabled without any reference to Dr. Seites's work. Dr. Burt's opinion was that plaintiff was disabled as of January 23, 2008, but this was based on plaintiff's self-report concerning when and why he left work. Dr. Burt was misled. In reality, plaintiff's leave from work at that time had nothing to do with any physical disability or job-related injury. It was the result of Dr. Kimmel's psychological evaluation after plaintiff's December 7, 2007, arrest. Dr. Henrichsen made a similar error in thinking that plaintiff's 2007 absence from work was due to physical incapacitation. When he became aware of the error, Dr. Henrichsen recanted his earlier date of incapacitation and said the earliest he could find plaintiff was permanently incapacitated for the performance of his job duties was January 19, 2011, the date he first examined plaintiff.

Plaintiff did not establish he was physically incapacitated between May 15, 2008, when he received his last check, and June 16, 2008, when his most favorable witness fixed the beginning of his continuous disability. Therefore, he did not establish he was continuously disabled between May 15, 2008 -- the date of discontinuance of service -- and May 22, 2009, when he submitted his application for service-connected disability retirement. Plaintiff's application was not timely made.

### B. Notice of Retirement Benefits

### 1. The Parties' Contentions

Although unclear, by referencing the March 11, 2009, letter from Kleczka and citing *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374 (*Hittle*), plaintiff appears to assert that he is entitled to disability retirement because he was given late notice of the retirement options available to him. He attributes this late notice to SCERS.

SCERS responds that "[t]here is no evidence that SCERS failed to inform [plaintiff] of any of his rights regarding disability retirement or breached its fiduciary

21

duty to him." SCERS points out that Kleczka is a County employee and that the County is a separate legal entity. Thus, any duty the County had to notify plaintiff about relevant options cannot be imputed to SCERS.

## 2. Analysis

Plaintiff has not developed this contention by citing case law, statutes, or providing argument on why the so-called late notice provided by the County warrants a finding that his application to SCERS was timely. Because plaintiff failed to develop this argument and explain why SCERS was responsible, we disregard his argument. As we have noted, we may properly disregard contentions perfunctorily asserted without legal development. (*Freeman, supra*, 8 Cal.4th at p. 482, fn. 2; *Carroll, supra*, 222 Cal.App.4th at p. 1412, fn. 5; *Bragg, supra*, 161 Cal.App.4th at pp. 1396-1397; *Tilbury Constructors, supra*, 137 Cal.App.4th at p. 482.) "We discuss those arguments that are sufficiently developed to be cognizable. To the extent [a party] perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis." (*Freeman*, at p. 482, fn. 2.) Because plaintiff failed to develop this argument and explain why SCERS was responsible for the County's letter, we disregard his argument.

In any event, as SCERS points out, it is a separate legal entity pursuant to section 31699.8, which states in part that retirement boards are "separate legal entities, and they and their boards, board members, and staffs, are liable only for their own actions or failures to act." (§ 31699.8, subd. (c).) Thus, we see no reason why the County's conduct can be imputed to SCERS. (See, e.g., *Comunidad en Accion v. Los Angeles City Council* (2013) 219 Cal.App.4th 1116, 1127-1129 [reasoning that because the local enforcement agency and the City of Los Angeles were two distinct legal entities, the agency's conduct could not be imputed to the city].)

As for plaintiff's reliance on *Hittle, supra*, 39 Cal.3d 374, a case he cites without any analysis, we do not see how it helps him. In *Hittle*, the plaintiff was injured soon

22

after he started work for a county. His treating chiropractor authorized him to return to work, but the plaintiff did not return. Nor did the plaintiff respond to a notice that his absence following this authorization provided grounds for termination under the county's civil service rules. (*Id.* at pp. 380-381.) Ultimately, a doctor employed by the county opined that the plaintiff would not be able to return to work in the same job. In the meantime, because the plaintiff failed to respond to the earlier notices, the retirement board sent the plaintiff two form letters telling him he needed to defer retirement or claim the $187.49 he had contributed to the retirement system; otherwise, his contribution would become part of the retirement system fund. (*Id.* at p. 381.) The letters and forms did not explain that the plaintiff was eligible for disability retirement benefits, although a handwritten note on the second letter told him not to withdraw his contribution if he intended to file for disability retirement. Limiting himself to the options on the form, the plaintiff requested and received a refund of his contributions. Later he learned he was eligible for disability retirement and made numerous requests to reinstate his right to obtain disability retirement benefits, which were rejected by the retirement board. (*Id.* at p. 382.) The trial court denied his writ petition, and on appeal, our high court reversed. (*Id.* at pp. 383, 394.) The court concluded the plaintiff did not knowingly waive his right to the disability retirement benefits (*id.* at pp. 388-391) and, moreover, the retirement board breached its fiduciary duty to plaintiff by essentially misrepresenting and concealing his right to those benefits. (*Id.* at pp. 393-394.)

Here, there is no evidence that SCERS breached any fiduciary duty to plaintiff, failed to inform him of or misled him about any of his rights regarding disability retirement, or caused plaintiff's delay in making his application. *Hittle* does not help plaintiff.

Lastly, we note from Kleczka's letter that Dr. Seites had submitted a letter to the County indicating plaintiff would need to be on leave through February 2, 2010. Plaintiff failed to submit a request for accommodation to the County after Kleczka sent him a

23

form for that purpose.  After Kleczka's March 11, 2009, letter outlining plaintiff's options and threatening discipline or termination, plaintiff finally applied for service-connected disability retirement.  There is no evidence in the record indicating plaintiff contacted SCERS before Kleczka's letter.  Based on the record before us, it appears SCERS was not in the picture until then.  That plaintiff did not apply for service-connected disability retirement sooner was his own doing.

### C.  Conclusion

There was substantial evidence supporting the finding that plaintiff's application for service-connected disability retirement was not timely.

### DISPOSITION

The judgment is affirmed.  Plaintiff shall pay SCERS's costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (5).)


        MURRAY        , J.

We concur:


      HULL          , Acting P. J.


      DUARTE       , J.

24