Filed 8/27/25  Estate of Breeze CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ESTATE OF DOUGLAS BREEZE et al., | C099877 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2022-80003799-CU-WM-GDS) |
| v. | |
| BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, | |
| Defendant and Respondent; | |
| REGIONAL GOVERNMENT SERVICES, | |
| Real Party in Interest and Appellant. | |

Twenty years ago, in *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, our Supreme Court held the Public Employees' Retirement Law (PERL) (Gov. Code § 20000 et seq.)[1] incorporates the common law test for employment, and that public agencies that contract with California's Public Employees' Retirement System

---

[1]     Undesignated statutory references are to the Government Code.

1

(CalPERS) are required to enroll their common law employees in CalPERS. In this case, the Board of Administration of CalPERS determined Douglas Breeze worked for the City of Atascadero as a common law employee after he retired from public service, in violation of rules governing postretirement employment, and the trial court upheld that determination. Breeze and the city appeal,[2] arguing (1) the Legislature has abrogated the common law test for employment in the circumstances of this case, (2) if the common law test applies, CalPERS and the trial court both erred when they found he was a common law employee, and (3) CalPERS's decision was based on underground regulations. We reject all three arguments and thus affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**[3]

From 1987 to 2007, Breeze worked for the Inland Empire Utilities Agency and for the cities of Riverside, Port Hueneme, and Ojai. For about half of this time, he was the public works director for the cities of Port Hueneme and Ojai. Through his employment, he was a member of CalPERS and was entitled to retirement benefits under the PERL. He retired in August 2007 and began receiving a CalPERS retirement allowance at that time.

A. *Breeze's postretirement work for the City of Atascadero*

In July 2014, around seven years after he retired, Breeze began working for the City of Atascadero (the City). Rachell Rickard was the city manager at the time. In June 2014, the city engineer/public works director retired, and Rickard began recruiting to fill

---

[2]    Breeze died during the pendency of the underlying administrative proceedings, and this lawsuit was brought by his estate. For simplicity, we to refer to appellant as Breeze.

[3]    Much of the factual background is taken from the underlying administrative decision and the trial court's decision in this case. Both decisions contain numerous factual findings, most of which Breeze and the City do not challenge, and they cite both decisions extensively in their briefs.

the position. In the meantime, she considered hiring an interim city engineer/public works director, but she had trouble finding qualified candidates. The City ultimately decided to hire an engineering firm to provide interim engineering services, and to contract with Regional Government Services (RGS) to provide someone to perform various nonengineering duties that fell under the City's public works department.[4] Breeze worked for the City pursuant to the RGS contract.

RGS is a joint powers authority created by the Association of Bay Area Governments and the City of San Carlos. According to RGS's executive director Richard Averett, it was formed "to provide a way for smaller public agencies to obtain professional level . . . services in . . . the quantity that they needed, the amount that they needed, so that they were able to get top level talent without going to the market and hiring that top level talent." Breeze's work for the City involved two separate contracts: (1) an "Agreement for Management and Administrative Services" between the City and RGS entered into on July 27, 2014; and (2) an "Employment Agreement" between RGS and Breeze entered into on July 23, 2014.

The agreement between RGS and the City provided RGS would assign Breeze to work for the City as a "Public Works Advisor" at a daily rate of $750. The start date was July 27, 2014, and the agreement was "anticipated to remain in force through December 31, 2014," although it could thereafter continue on a month-to-month basis until terminated. The "scope of work" Breeze would perform included assisting the city manager with: "Planning, organizing, directing, supervising and performing activities related to building, zoning, and . . . land use planning policy development";

---

[4] Rickard testified the City hired an engineering firm because RGS did not have anyone who could perform the "engineering side" of the position. Breeze is not an engineer, and thus was not qualified to perform the engineering functions in the city engineer/public works director job description.

3

"[a]dministering the General Plan, zoning ordinance, subdivision ordinance and related regulations"; "[r]esearching complex planning problems related to infill, community character and neighborhood preservation and preparing a variety of comprehensive reports"; and "[m]aking presentations to the City Council, other Boards, Commissions and Committees, City departments and public and private groups on land use and related matters."

The agreement also provided: "It is understood that the relationship of RGS to [the City] is that of independent contractor and all persons working for or under the direction of RGS are its agents and employees and not agents or employees of [the City]. . . . [¶] . . . [¶] [The City] shall not have the ability to direct how services are to be performed, specify the location where services are to be performed, or establish set hours or days for performance, except as set forth [herein]." It also provided: "RGS shall assign only competent personnel to perform services pursuant to this Agreement. In the event that [the City], in its sole discretion, at any time during the term of this Agreement, desires the reassignment of such person or persons, RGS shall consider reassigning such person or persons." Finally, it provided either party could terminate the agreement "with or without cause, upon 30 days written notice," and the City "has the sole discretion to determine if the services performed by RGS are satisfactory . . . . If the [City] determines that the services performed by RGS are not satisfactory, the [City] may terminate this agreement by giving written notice to RGS."

The agreement between RGS and Breeze provided Breeze was an "at-will" "employee" of RGS, and RGS would assign him to the City "to perform public works executive duties." RGS would pay him $70 an hour. Either party could terminate the agreement on one day's written notice. The agreement stated Breeze "will also be assigned to other clients," but Breeze testified the City is the only client RGS ever assigned him to.

4

Breeze worked for the City pursuant to the RGS contract for a little over three months, from July 28 to November 6, 2014. During this time, he considered himself to be an employee of RGS, not of the City. He reported his time to RGS using RGS's payroll system. RGS paid him and, and in turn, billed the City for the hours he worked. RGS provided him with a W-2. He acknowledged receiving RGS's personnel rules, and he considered himself bound by those rules, not the City's rules. RGS—not the City— was responsible for providing him with workers' compensation, disability insurance, sick leave required by law, and "anything else that the law might require that [an employer] provide to an employee."

Breeze had a City e-mail address and telephone number and an office in City Hall, where he performed the majority of his work. He was identified as the interim public works director. Rickard testified she identified Breeze as the interim public works director "for efficiency" and so that people would understand he would "be taking over and doing some of the . . . stuff . . . our previous Public Works Director" had done. Breeze attended city council meetings, where he was identified as one of the "staff present," and he gave at least one "staff report" to the city council. He was copied on numerous e-mails regarding the day-to-day operations of the public works department.

Breeze had a master's degree in public administration and almost 27 years of experience in "the public works arena." When asked to describe his work for the City, he testified he "managed the public works operations and . . . determined work procedures and made schedules of work for the public works employees." He explained, "When I arrived at the City of Atascadero and met with the City Manager, she asked me to keep the Public Works Department operating while they did a recruitment." He testified the employees in the public works department looked to him "for supervision over their . . . daily tasks," and he talked to them about work-related issues "as they came up and how to address them and how to respond to them." He worked "every day of the week," from the time department employees "reported for work . . . until they were off work." He

5

approved requests for time off from department employees (although Rickard testified she did not ask him to do this). He met with Rickard weekly or biweekly along with other department heads "to talk about the issues of the city and coordinate any work issues with each other." He testified the city manager did not supervise how he did his work or train him. When asked how he knew what to work on, he responded as follows: "As a Public Works Director, you do mental gymnastics from the minute you arrive at work until you leave. You never know what's going to pop up. You know what you have planned in the various areas of your responsibility and you do your best to get those plans accomplished, while at the same time addressing all the issues that pop up in the meantime, including personnel issues, financial issues, scheduling issues." Breeze testified the type of work he did for the City was "consistent with" the type of work he did as public works director for other cities before he retired.

Rickard testified she did not expect Breeze to supervise City employees, and she specifically told several department employees that Breeze "was not their supervisor." She also testified she did not consider herself to be Breeze's supervisor and he did not report to her. Instead, she testified RGS was his supervisor. She did not train Breeze, and nobody at the City had the expertise to train him. She testified, "I didn't have the ability to tell him step by step how do [the job], but I certainly had the ability to ask for, hey, this is what I need to have done. These are the considerations that we need to do while doing it and go through that. But, you know, do I say, okay, [you] need to work these hours, in this place, and this is what I expect. I didn't have those types of conversations with him." She described the work Breeze did as "air traffic control." She elaborated, "people are calling to complain about potholes in their roads, or a city tree, or, hey, the Wastewater guys are having problems with the street guys, or the Administrative Services Director has a question, and so, he's going to, you know, delegate those out and kind of make sure things run smoothly, and kind of provide some of that coordination." If Breeze "had questions about work that the Department needed to do," he would talk to Rickard, and if

Rickard "had things [she] needed him to do," she would talk to Breeze. As city manager, Rickard acknowledged she was "ultimately responsible for the work being conducted by the Public Works Department."

Breeze worked for the City until it hired a new permanent city engineer/public works director.

## B.     *The underlying administrative proceedings*

In February 2018, CalPERS began investigating the nature of Breeze's relationship with the City, and in January 2020, it determined he was a common law employee and his employment violated certain postretirement employment rules.

Breeze and the City appealed, and an evidentiary hearing was held before an administrative law judge (ALJ) from the Office of Administrative Hearings. Following the hearing, the ALJ issued a proposed decision finding Breeze was a common law employee of the City, and his employment violated the applicable postretirement employment rules,[5] and CalPERS adopted the ALJ's proposed decision in its entirety.

## C.     *The trial court proceedings*

Breeze and the City challenged the decision by filing a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5. They argued the evidence did not

---

[5]     Briefly, the PERL provides, "A retired person shall not serve, be employed by, or be employed through a contract directly by, a public employer in the same public retirement system from which the retired person receives the benefit without reinstatement from retirement, except as permitted by this section." (§ 7522.56, subd. (b).) "A person who retires from a public employer may serve without reinstatement . . . upon appointment by . . . a public employer . . . because the retired person has skills needed to perform work of limited duration," but such appointments "shall not exceed a total for all employers . . . of 960 hours . . . in a . . . fiscal year" and "[t]he rate of pay for the employment shall not . . . exceed the maximum . . . paid by the employer to other employees performing comparable duties." (*Id*., subds. (c), (d).) The ALJ found Breeze violated the postretirement employment rules because his rate of pay was greater the maximum rate authorized for the public works director, and Breeze does not challenge that finding.

7

support the finding that Breeze was a common law employee and the ALJ "made numerous errors of law" that were effectively adopted by CalPERS. They also sought a judicial declaration that the challenged decision "is predicated on unlawful 'underground regulations' and, thus, is ultra vires." The parties agreed the challenged decision implicated Breeze's fundamental vested right to receive a retirement benefit, and the trial court was thus authorized to exercise its independent judgment on the evidence.[6] Applying its independent judgment, the trial court found the evidence supported CalPERS's determination that Breeze was a common law employee of the City. We will discuss the basis for the trial court's decision below. Judgment was entered denying the petition, and Breeze and the City filed a timely notice of appeal.

Although not directly relevant to this appeal, we note the trial court related this case with four other cases that also involve CalPERS retirees who provided services to cities through RGS.[7] The petitioners in all five related cases challenged CalPERS's finding that they were common law employees. The trial court found in favor of the petitioner in one of the cases (*Abid-Cummings v. Board of Administration of the Public Employees' Retirement System*, Super. Ct. Sac. County, 2023, No. 34-2022-80003798 (*Abid-Cummings*)), and in favor of CalPERS in the other four cases, including this case,

---

[6]    "Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local agency." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137, fn. omitted.) Where it is claimed the agency's findings are not supported by the evidence, two standards of review apply at the trial court level: the independent judgment standard and the substantial evidence standard. The independent judgment standard applies in cases where the agency's decision affects a fundamental vested right, and the substantial evidence standard applies in all other cases. (*Id*. at pp. 143-144.)

[7]    Both parties have asked us to judicially notice the related case order. We deny both requests as unnecessary because that order is already part of the record and thus does not need to be judicially noticed.

8

and the petitioners in those four cases all appealed. The other three appeals are: (1) *Sandhu v. Board of Administration of the Public Employees' Retirement System*, No. C100028; (2) *Souza v. Board of Administration of the Public Employees' Retirement System*, No. C099861; and (3) *Dowswell v. Board of Administration of the Public Employees' Retirement System*, No. C100027. In February 2025, we issued a published decision affirming the judgment in the *Sandhu* case (and we note that Breeze and the City raise many of the same arguments that we resolved in the *Sandhu* case).

In their briefs, Breeze and the City rely extensively on the trial court's decision in the *Abid-Cummings* case. Like Breeze, Linda Abid-Cummings worked for a city after she retired, and she worked pursuant to the same contract between the city and RGS that Breeze worked pursuant to. Unlike Breeze, however, the trial court found Abid-Cummings was not a common law employee of the city. It thus granted Abid-Cummings' petition for writ of mandate and entered judgment in her favor, and CalPERS did not appeal. Breeze spends much time arguing the facts in this case are "virtually the same" as the facts in *Abid-Cummings* and criticizing the trial court for "contradicting" its analysis and findings in that case. He also asks us to judicially notice the trial court's decision and the transcript of the hearing in *Abid-Cummings*. We deny the request because "only *relevant* material may be [judicially] noticed," and the trial court's decision in *Abid-Cummings* is not relevant to our resolution of this appeal. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, disapproved on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276; see also *Pereira-Goodman v. Anderson* (1997) 54 Cal.App.4th 864, 872, fn. 5 [declining to take judicial notice of superior court decision and noting such decisions "do not have precedential value"].) One of the primary issues in this case is whether the trial court's finding that Breeze was a common law employee is supported by substantial evidence, not whether it is consistent with a contrary finding in another case. Accordingly, the trial court's finding that Abid-

9

Cummings was not a common law employee—which finding was not appealed—is not relevant to this appeal.[8]

## DISCUSSION

Breeze and the City (collectively Breeze) make three arguments on appeal: (1) the common law test for employment is not applicable to the facts of this case; (2) even if it is applicable, the trial court misapplied the test and/or erred in finding he was a common law employee; and (3) CalPERS's decision was based, at least in part, on underground regulations. We discuss each argument in turn. We note at the outset that Breeze's briefs contain a total of 96 footnotes, many of which contain arguments not raised in the body of the briefs. "Footnotes are not the appropriate vehicle for stating contentions on appeal" (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947), and we thus have not considered arguments raised only in footnotes (*Requa v. Regents of University of California* (2012) 213 Cal.App.4th 213, 226, fn. 9).

I

*The Common Law Test Applies*

Breeze's first argument is that the common law test for employment does not apply because, under the circumstances of this case, it has been abrogated by sections 37103 and 53060. We disagree.

Pursuant to the PERL, CalPERS provides retirement benefits to its "members," who include "not only state employees but also employees of 'contracting agencies,' that is, public entities . . . that have chosen to participate in CalPERS by contract with the CalPERS governing board. (§§ 20022, 20460.)" (*Metropolitan Water Dist. v. Superior Court, supra*, 32 Cal.4th at p. 499 (*Metropolitan*).) Here, all of the cities that Breeze

_____

[8]    For similar reasons, we deny CalPERS's request for judicial notice of the trial court's decision in the other related cases, and both parties' requests for judicial notice of other nonprecedential CalPERS decisions.

worked for prior to his retirement in 2007 were contracting agencies, as is the City of Atascadero.

The PERL defines a " '[m]ember' " as "an employee who has qualified for membership in this system and on whose behalf an employer has become obligated to pay contributions" (§ 20370, subd. (a)), and an "employee[] of a contracting agency" (§ 20383), and it defines an " '[e]mployee' " as "[a]ny person in the employ of any contracting agency" (§ 20028, subd. (b)). "Membership in [CalPERS] is compulsory for all employees." (§ 20502, subd. (a)(3).) "As these provisions indicate, only an agency's *employees*—not those performing services for the agency on other terms—may be enrolled in CalPERS. The PERL makes this rule explicit in section 20300, subdivision (b), which excludes from CalPERS membership '[i]ndependent contractors who are not employees.' " (*Metropolitan, supra*, 32 Cal.4th at p. 499.)

In *Metropolitan, supra*, 32 Cal.4th 491, our Supreme Court held the PERL incorporates the common law test for employment to distinguish employees from independent contractors. Like this case, *Metropolitan* involved a public agency that contracted with CalPERS to provide retirement benefits to its employees, and also contracted with several labor suppliers to provide it with temporary workers. (*Metropolitan* at pp. 496-497.) The agency considered the workers to be consultants rather than employees and it did not provide them with benefits that were contingent on employment. (*Id*. at p. 497.) A group of workers sued the agency, arguing they were employees and were entitled to all employment-related benefits, including membership in CalPERS, and the trial court permitted CalPERS to intervene in the action. (*Id*. at pp. 497-498.)

Prior to trial, the trial court decided a threshold issue and ruled the agency was required to enroll all common law employees in CalPERS. (*Metropolitan, supra*, 32 Cal.4th at p. 498.) The parties sought review of that ruling by petition for writ of mandate, the appellate court denied the petition, and our Supreme Court granted review

11

to decide what it deemed a "purely legal" issue: whether the PERL required a contracting agency "to enroll in CalPERS all workers who would be considered [its] employees under California common law." (*Metropolitan*, at p. 496; see *id*. at p. 498.) The agency argued, "it may exclude from enrollment workers, such as plaintiffs, who are paid through private labor suppliers, even if they would be employees under the common law test." (*Id*. at p. 496.) The court disagreed, holding, "the PERL incorporates common law principles into its definition of a contracting agency employee and that the PERL requires contracting public agencies to enroll in CalPERS all common law employees except those excluded under a specific statutory . . . provision." (*Ibid*.)

The court began its analysis by noting, "As to contracting agencies, the PERL gives the term ['employee'] no special meaning, stating simply that an 'employee' means '[a]ny person in the employ of any contracting agency.' (§ 20028, subd. (b).)" (*Metropolitan, supra*, 32 Cal.4th at p. 500.) It then explained, "In this circumstance—a statute referring to employees without defining the term—courts have generally applied the common law test of employment," and, "[u]nless given reason to conclude the Legislature must have intended the term to have a different meaning in section 20028, subdivision (b), we also can only adhere to the common law test." (*Id*. at pp. 500, 501.) Finally, it concluded, "the PERL's provision concerning employment by a contracting agency (§ 20028, subd. (b)) incorporates a common law test for employment, and . . . nothing elsewhere in the PERL . . . supports reading into the PERL an exception to mandatory enrollment for employees hired through private labor suppliers." (*Id*. at p. 509.)

RGS is analogous to a labor supplier that provides temporary workers to contracting agencies, and *Metropolitan* teaches that if those temporary workers meet the common law test for employment, then they are employees for purposes of the PERL. Breeze attempts to distinguish *Metropolitan* by noting the workers in that case provided full-time and long-term services, while he provided services "on a part-time basis for

12

some 3 months." He fails to explain why this fact would affect the purely legal issue decided in *Metropolitan*.

Breeze highlights a dissenting opinion in *Metropolitan* that found the common law test should be modified in cases involving labor suppliers like RGS and so-called leased workers like Dowswell. The dissent noted, "[l]eased workers present a new paradigm" that is based on "a three-sided labor relationship" as opposed to the more traditional two-sided labor relationship. (*Metropolitan, supra*, 32 Cal.4th at pp. 512, 514 (dis. & conc. opn. of Brown, J.).) It also noted that when the common law employment test was developed, "employee leasing in its purest form did not even exist. Thus, it differentiates only between employees and independent contractors, not employees and leased workers." (*Id*. at p. 514 (dis. & conc. opn. of Brown, J.).) The dissent thought "[c]ommon law rules that evolved to address the traditional two-sided labor paradigm are simply inapposite in this [new three-sided] context," and it suggested the common law test needed to evolve to specifically address leased workers. (*Ibid*. (dis. & conc. opn. of Brown, J.).) In particular, it believed that, in leased worker situations, the intent of the parties should be "the principal consideration in determining plaintiffs' employee status."[9] (*Metropolitan*, at p. 515 (dis. & conc. opn. of Brown, J.).) The dissent thus would have found the leased workers at issue were independent contractors because the public agency that retained them through a private labor supplier "intended to avoid entering into an employer-employee relationship with [them], and they, in turn, willingly accepted their jobs on the terms offered." (*Ibid*. (dis. & conc. opn. of Brown, J.).) Under the dissent's view, Breeze might well be found an independent contractor, because that appears to be what all three parties (i.e., Breeze, the City, and RGS) intended. A dissent,

---

[9]    As discussed below, the intent of the parties is just one of numerous secondary factors that courts may consider under the common law test, but it is not determinative.

13

however, is just that—a dissent—and it is axiomatic that dissents are not the law. (See *People v. Lopez* (2012) 55 Cal.4th 569, 585.)

The *Metropolitan* majority acknowledged the dissent's concerns, and noted, "Nothing we say here precludes the Legislature, if it so chooses, from amending the PERL to declare leased workers to be the employees of the labor suppliers." (*Metropolitan, supra*, 32 Cal.4th at p. 508.) The Legislature has not done so. After the *Metropolitan* decision was issued in 2004, the Legislature amended three of the statutes cited by the court to hold the PERL incorporates the common law test of employment, but none of the amendments addressed labor suppliers or leased workers or created different rules for them. (See *Metropolitan*, at pp. 499-500, 506, 508 [citing §§ 20370, 20300, & 20028]; Stats. 2007, ch. 355, § 9 [amending § 20370]; Stats. 2008, ch. 322, § 2 [amending § 20300]; Stats. 2007, ch. 355, § 2 [amending § 20028].) " 'The Legislature is presumed to have knowledge of existing judicial decisions when it enacts and amends legislation. When the Legislature amends a statute that has been the subject of judicial construction, changing it only in part, the presumption is that the Legislature intended to leave the law unchanged in the aspects not amended.' " (*Chango Coffee, Inc. v. Applied Underwriters, Inc.* (2017) 11 Cal.App.5th 1247, 1253.) Thus, the Legislature's decision to amend the PERL without addressing the *Metropolitan* court's conclusion that it contains no exception to mandatory enrollment for leased workers hired through labor suppliers suggests the Legislature intended to leave that conclusion unchanged and has not seen fit to adopt the dissent's view. "In other words, the Legislature has not seen a need to enact legislation to counter the decision in" *Metropolitan*. (*William S. Hart Union High School Dist. v. Regional Planning Com.* (1991) 226 Cal.App.3d 1612, 1624; see also *In re Marriage of Sahafzadeh-Taeb & Taeb* (2019) 39 Cal.App.5th 124, 141 [if the Legislature thought a case interpreted a statute incorrectly, "it could have, and undoubtedly would have, said so and taken corrective action" when it amended the statute].)

14

Despite *Metropolitan*'s holding that the PERL incorporates the common law test for employment, Breeze contends that test does not apply because sections 37103 and 53060 have effectively abrogated it in the circumstances of this case.[10] (*Metropolitan, supra*, 32 Cal.4th at p. 496.) We disagree.

Section 37103 provides a city "may contract with any specially trained and experienced person, firm, or corporation for special services and advice in financial, economic, accounting, engineering, legal, or administrative matters."[11] Similarly, section 53060 provides any public or municipal corporation (which includes a city) "may contract with and employ any persons for the furnishing . . . [of] special services and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the special

---

[10] Breeze also cites a third statute, section 54981, which provides, "The legislative body of any local agency may contract with any other local agency for the performance by the latter of municipal services or functions within the territory of the former." However, he never discusses this statute or explains its applicability to this case, and we thus do not address it.

[11] Breeze asks us to judicially notice some of the legislative history of section 37103. Although legislative history is subject to judicial notice, we deny the request because Breeze makes no attempt to explain how this legislative history is relevant or how it helps us interpret section 37103. (See *People v. Investco Management & Development LLC* (2018) 22 Cal.App.5th 443, 471, fn. 8 [denying request to judicially notice legislative history because it is "not relevant to a material issue in this case"].) Breeze's sole mention of this legislative history is in a footnote where he states only that he "has obtained the legislative history of Government Code § 37103." It is not our job to comb through the legislative history to develop an argument on Breeze's behalf. (See *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 ["It is not our responsibility to develop an appellant's argument"].) Breeze also asks us to judicially notice the legislative history of section 7522.56, but he never mentions this legislative history in his briefs or explains its relevance to this case, and we thus deny that request as well. We deny Breeze's request that we judicially notice CalPERS Publication No. 33 ("A Guide to CalPERS Employment After Retirement") for similar reasons (i.e., he never mentions this document in his briefs or explains its relevance to this case).

15

services required." Breeze argues the City exercised its statutory authority to "contract" for "special services" when it entered into its contract with RGS. This may be true, but it is not relevant because nobody is contending the City lacked authority to enter into a contract with RGS for Breeze's services. Instead, the issue in this case is whether Breeze was an employee within the meaning of the PERL when he was performing those special services for the City.

Breeze argues, variously, that: (1) sections 37103 and 53060 have preempted, abrogated, or modified the common law test in the circumstances of this case; (2) "[t]he power to contract for specialized services necessarily means that the RGS contract describes the legal relationship [between the City and Breeze] even if one or more common law criteria of employment might exist"; and (3) "the plain language of Government Code § 37103 grants [the City] the right to utilize contracting rather than direct employment as a means to obtain specialized services from RGS and RGS's assigned employee, Breeze." Breeze's argument is not entirely clear. It appears, however, that he contends the fact that sections 37103 and 53060 use the word *contract*— i.e., a city "may contract . . . for special services"—means that any person providing such special services is, ipso facto, an independent *contractor*. Not so.

The fact that cities are authorized to contract for special services says nothing about whether the person providing those services is an independent contractor or an employee. And as our Supreme Court has held, " 'the employment relationship is fundamentally contractual.' " (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 335.) Thus, contracting for special services is perfectly compatible with finding the person providing those services is an employee. Indeed, Breeze was hired by RGS pursuant to a contract that identified him as an employee, and RGS thus both *contracted* for Breeze's services and *employed* him. Moreover, section 53060 provides a city may "contract with and employ" (italics added), a person to furnish special services, which appears to

16

acknowledge that a person may be employed by contract, and, perhaps more importantly, to recognize that a person hired by a city pursuant to section 53060 may be an employee.

Breeze cites case law that holds the common law is inapplicable when it has been modified by statute. (See, e.g., *Lowman v. Stafford* (1964) 226 Cal.App.2d 31, 39 ["when modified by state statutes, the common law is inapplicable in California"]; *Monterey Club v. Superior Court* (1941) 48 Cal.App.2d 131, 145 ["In California the common law is inapplicable where . . . it has been modified by our statutes"].) This is true, but there is nothing in the language of sections 37103 and 53060 that suggests either statute modifies the common law test for employment for purposes of the PERL.

Breeze also cites the statement in *Metropolitan* that, "[u]nless given reason to conclude the Legislature must have intended the term ['employee'] to have a different meaning . . . , we . . . can only adhere to the common law test." (*Metropolitan, supra*, 32 Cal.4th at p. 501.) Again, however, nothing in the language of sections 37103 or 53060 gives us reason to conclude the Legislature must have intended to modify the meaning of the term "employee" for purposes of the PERL when a city contracts for special services. Indeed, we note that section 37103 does not contain the term "employee" or any variation thereof, much less define the term, and section 53060 uses the term "employ" without further definition and would thus appear to be governed by *Metropolitan*'s holding that when a statute refers to employment without defining the term, "courts have generally applied the common law test." (*Metropolitan*, at p. 500.)

Breeze argues we must harmonize the PERL with sections 37103 and 53060 and must give effect to each statute. We agree. As our Supreme Court has emphasized, " 'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions.' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.) Here, however, we find no inconsistency or conflict between the PERL's utilization of the common law employment test, and a city's authority to contract

17

for special services pursuant to sections 37103 and 53060.  Instead, we harmonize and give effect to all of these statutory provisions as follows:  If a contracting agency contracts with a person or a firm for special services as authorized by sections 37103 and 53060, then the common law employment test is used to determine whether the person providing those services is an employee for purposes of the PERL (in which case the person must be enrolled in CalPERS), or an independent contractor (in which case enrollment is not required).  Thus, we largely agree with Breeze's assertion that "the Legislature cannot have intended that every professional consultant a public agency engages must be enrolled as a CalPERS member."  Instead, only those consultants who meet the common law employment test must be enrolled.

Breeze cites *Handler v. Board of Supervisors* (1952) 39 Cal.2d 282 and *Kennedy v. Ross* (1946) 28 Cal.2d 569, for the proposition that "[p]ersons performing specialized services on a temporary basis have been held to be neither officers nor employees of the governmental body."  Neither case stands for the proposition that a person performing specialized services can never be deemed an employee, and neither case deals with the issue raised here.

In *Handler*, a county entered into a contract with an attorney and an engineer to assist the district attorney on a discrete project, and one of the issues was whether the attorney and the engineer could be hired by resolution of the board of supervisors, or whether they had to be hired pursuant to ordinances governing the employment of what the court referred to as "officers and regular employees."  (*Handler v. Board of Supervisors, supra*, 39 Cal.2d at p. 286; see *id*. at pp. 283-284.)  The court noted counties were authorized by law to contract with and employ persons to provide special services and advice in legal and engineering matters, and it held such persons could be hired by resolution.  In so holding, the court noted in passing that "[p]ersons performing specialized expert services do so on a temporary basis and are neither officers nor [regular] employees, nor do they hold a position with the county.  They are more akin to

18

independent contractors." (*Id*. at p. 286.)  The court did *not* hold that all persons performing specialized services on a temporary basis are independent contractors rather than employees for purposes of the PERL.

In *Kennedy*, a city entered into a contract with an engineer to furnish plans and specifications for a public works project.  Someone filed a lawsuit against the city to restrain it from paying the engineer "on the ground that . . . the [engineer] had not been exempted by the civil service commission pursuant to certain provisions of the city charter." (*Kennedy v. Ross, supra*, 28 Cal.2d at p. 571; see *id*. at pp. 570-571.)  As a result of the lawsuit, the city controller refused to pay the engineer, and the engineer sought a writ of mandate directing the controller to pay him.  The controller argued the contract was illegal because it did not comply with the "civil service employment system" established by the city charter.  (*Id*. at p. 571.)  The city's civil service commission opined the engineer "was an independent contractor" and was not "subject to the civil service provisions of the charter." (*Id*. at p. 572.)  The court agreed, noting that, "[t]he provisions of the charter do not foreclose the [city] from entering into contracts with individuals for the performance of professional services as independent contractors," and the civil service system created by the charter only applies " 'to persons *employed in permanent positions* in municipal departments.' " (*Id*. at pp. 572, 573.)  As in *Handler*, the court did not hold that all persons performing specialized professional services for a city are independent contractors rather than employees for purposes of the PERL.

Breeze also cites an Attorney General opinion for the proposition that section 53060 permits a public agency to employ persons with special skills to provide special services when those services cannot be provided by the agency's own employees.  The issue in that case, however, was whether the special services could be provided by the agency's employees, not whether persons providing special services are employees or independent contractors.  (19 Ops.Cal.Atty.Gen. 153, 155 (1952).)

19

The *Handler* and *Kennedy* cases and the Attorney General opinion contain no discussion of the common law test for employment, no discussion of the meaning of the term "employee" in the PERL, and no discussion of any other issue that is relevant to this case, and it is axiomatic that "case[s] [are] not authority for propositions not considered and decided." (*Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1214-1215.)

In sum, we find nothing in sections 37103 and 53060 affects the holding in *Metropolitan* that contracting agencies are required to enroll all common law employees in CalPERS.

II

*Substantial Evidence Supports the Trial Court's Conclusion that Breeze Was a Common Law Employee*

Breeze next argues the trial court's finding that he was a common law employee is not supported by the evidence. We disagree. We first describe the common law test and the trial court's application of that test. We then discuss the applicable standard of review. Finally, we explain why the trial court's finding that Breeze was a common law employee is supported by the evidence.

A.     *The common law test*

"The distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him. The principal's supervisory power was crucial in that context because ' . . . [the] extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question whether the employer ought to be legally liable for them. . . .' [Citations.] Thus, the 'control of details' test became the principal measure of the servant's status for common law purposes." (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 (*Borello*).) "Following common law tradition, California decisions . . . uniformly declare that '[t]he principal test

20

of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " (*Ibid*.) Our Supreme Court has emphasized that "what matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 533 (*Ayala*).) "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " (*Id.* at p. 531.)

Although "the right to control work details is the 'most important' or 'most significant' consideration," courts also consider other factors or " 'secondary' indicia of the nature of a service relationship." (*Borello, supra*, 48 Cal.3d at p. 350.) These other factors include: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id*. at p. 351; see also *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949 (*Tieberg*).) These factors " 'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello*, at p. 351.)

B.    *The trial court's ruling*

The trial court found the weight of the evidence supported CalPERS's determination that Breeze was a common law employee. It first found the City had the

21

right to control his work as evidenced by the fact that it could terminate his services without cause. It noted, "Breeze was specifically identified as the RGS staff that would be performing under the terms of the City's Contract [with RGS], and that contract permitted the City to terminate the contract without cause with 30-days['] notice. Accordingly, the City could effectively terminate Breeze's services with it." The trial court acknowledged the contract between RGS and the City stated the City could not direct how Breeze's work was to be performed, but it found "the parties' actual conduct established otherwise." As an example, it noted "Rickard had the ability to tell Breeze what she needed done and considerations that he needed to make while doing his job." It thus found "the control factor weighs in favor of an employee-employer relationship."

The trial court then discussed the secondary factors.[12] It found three secondary factors weighed in favor of an employment relationship: (1) the work Breeze performed was part of the regular business of the City; (2) the work was usually done by a City employee under the supervision of the City; and (3) Breeze was paid by the hour rather than by the job (although it found this factor weighed only "slightly in favor of an employee-employer relationship"). It also found three secondary factors were either neutral or not relevant in the circumstances of this case: (1) the skill required was neutral because Breeze was performing work that was typically performed by a highly skilled City employee; (2) who supplied the tools and the place of work was not relevant because the services Breeze was providing were intellectual and case law teaches "the factor of

---

[12] In a footnote, the trial court briefly noted one of the secondary factors is "whether the one performing services is engaged in a distinct occupation or business" (*Borello, supra*, 48 Cal.3d at p. 351), and it stated, "The work Breeze performed as a Public Works Advisor is not distinct from the City's regular business." Breeze does not discuss this factor other than to state the following: "That RGS and its employee Breeze had a distinct business of consulting based on RGS' staff expertise is clear from both the Breeze employment agreement and RGS contract." There is no citation to the record and no further discussion or analysis of this factor, and we thus do not consider it further.

ownership of tools is of little importance where the service to be performed is an intellectual endeavor" (*Tieberg, supra,* 2 Cal.3d at p. 954); and (3) the length of time the services were performed was neutral because Breeze's services were only needed until the City could fill the position permanently. Finally, the trial court disregarded the one factor that weighed in favor of an independent contractor relationship—the belief or intent of the parties—because, "[c]ourts ignore the parties' characterization [of their relationship] if their actual conduct establishes a different relationship." (*Vendor Surveillance Corp. v. Henning* (2021) 62 Cal.App.5th 59, 84.)

## C.    Standard of review

In a case such as this one, "[w]here the trial court has independently reviewed an administrative agency's factual findings, an appellate court applies the substantial evidence test to *the findings of the trial court*." (*Davis v. Civil Service Com.* (1997) 55 Cal.App.4th 677, 686, italics added.) "In applying the substantial evidence test, '[the] appellate court focuses on the findings of the trial court, rather than those of the administrative agency.' " (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 388, fn. 9.) The substantial evidence test is deferential. "We must uphold the trial court's findings unless they are ' " 'so lacking in evidentiary support as to render them unreasonable.' " ' " (*Molina v. Board of Administration, etc.* (2011) 200 Cal.App.4th 53, 61.) "[W]e must draw all legitimate and reasonable inferences in favor of the trial court's decision." (*Bell v. Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 309.) " 'The judgment will be upheld if there is any substantial evidence in support of each of the trial court's essential findings; all contrary evidence will be disregarded on appeal.' " (*Hittle,* at p. 388, fn. 9.)

Breeze argues we must review the finding that he was an employee de novo, giving "no deference" to the trial court's decision. We disagree.

"The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the [agency's]

23

decision must be upheld if substantially supported. [Citation.] If the evidence is undisputed, the question becomes one of law [citation], but deference to the agency's view is appropriate." (*Borello, supra*, 48 Cal.3d at p. 349.) Numerous cases hold, "[t]he question whether one is an independent contractor on the one hand or an . . . employee on the other, is *ordinarily* one of fact, the determination of which by the trial court on substantial evidence will be binding on the reviewing tribunal." (*Rogers v. Whitson* (1964) 228 Cal.App.2d 662, 672, italics added; see also *Vendor Surveillance Corp. v. Henning, supra*, 62 Cal.App.5th at p. 75 ["Determining whether a person is an employee or an independent contractor is *generally* a question of fact if it depends on resolving disputes in the evidence" (italics added)]; *Brose v. Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 ["Whether a person is an employee or an independent contractor is *ordinarily* a question of fact" (italics added)].) The question of whether a person is an employee or an independent contractor becomes a question of law "only if the evidence is undisputed" (*Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 948), or if the evidence supports only one credible conclusion (*Borello*, at p. 349), or "if from all the facts only one inference may be drawn" (*Brose*, at p. 1081).

Breeze contends the question of whether he was an employee or an independent contractor is one of law because the evidence in this case is undisputed. We acknowledge that much (but not all) of the evidence is undisputed. However, this is not a case where only one inference or conclusion may be drawn from the evidence. Our task is thus to decide whether the trial court's decision is supported by substantial evidence.

D.    *Analysis*

    i.    *Indicia of RGS Employment*

Breeze's first argument is that the trial court erred by failing to consider the indicia of his employment relationship *with RGS*. We disagree. The issue in this case is whether a common law employment relationship existed between Breeze and the City, not whether a common law employment relationship existed between Breeze and RGS. As

24

the trial court correctly noted, "the working relationship at issue is the one between Breeze and the City."

In this regard, we note that a long line of case law recognizes that dual employment or coemployment may exist when an entity like RGS supplies workers to clients such as the City. As our Supreme Court has explained, "The possibility of dual employment is well recognized in the case law. 'Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers.' " (*Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174; see also *Martinez v. Combs* (2010) 49 Cal.4th 35, 76 [noting there may be "situations in which multiple entities control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work"].)

Indeed, in *Metropolitan* itself, our Supreme Court recognized the possibility that, in a case such as this one, where an entity like RGS supplies workers to clients like the City, a particular worker could have "coemployers" who "share or allocate between them certain responsibilities of employment." (*Metropolitan, supra*, 32 Cal.4th at p. 506.) Much like Breeze does here, the labor suppliers in *Metropolitan* argued, "the PERL . . . should be construed to recognize coemployment," and to hold that "labor suppliers, rather than their clients . . . should be deemed the employers for purposes of the PERL, thus excluding workers they supply from the public retirement system." (*Ibid*.) The court rejected this argument, holding, "No legitimate basis exists . . . for finding a coemployment exception to the PERL." (*Ibid*.) It also noted the Legislature has recognized that leased workers are "a special case in certain contexts," but has *not* "provided in the PERL for any coemployment exception to a contracting agency's duty to enroll [common law] employees in CalPERS. The only relevant legislative choice to date has been to require enrollment of all persons in the 'employ' of the contracting agency."

25

(*Ibid*.)  And, as discussed above, it held the PERL incorporates the common law test of employment.

We note there was no suggestion in *Metropolitan* that indicia of a common law employment relationship between the leased workers and the labor suppliers was relevant to the issue of whether the leased workers were common law employees of the contracting agency for purposes of the PERL.  Thus, we agree with the trial court that the only relevant question in this case is whether Breeze was a common law employee of the City.

ii.      *The Trial Court's Application of the Common Law Test*

Breeze's second argument is that the trial court "failed to apply the uncontroverted evidence in a manner consistent with the law."[13]  We understand this to mean either that the trial court misapplied the common law test, or that its findings about the various factors are not supported by substantial evidence, or both.  We start with the trial court's finding on the primary factor—the right to control—and then consider its findings on those secondary factors that Breeze discusses.

a.      *The Primary Factor–the Right to Control*

As noted above, " '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' "  (*Borello, supra*, 48 Cal.3d at p. 350.)  As also noted above, case law teaches, "[p]erhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' "  (*Ayala, supra*, 59 Cal.4th at p. 531.)

---

**13**      Breeze also argues the trial court failed to apply the evidence "in a manner consistent with . . . *Abid-Cummings*."  As discussed above, the trial court's decision in *Abid-Cummings* is not relevant.

26

Breeze argues the City had no power to terminate his employment—only RGS had that power. If the City was not satisfied with his services, its only recourse was to terminate the RGS contract or request another RGS advisor. That is essentially what the trial court found as well: i.e., it found that the City could effectively terminate Breeze's relationship with it, even if the City could not terminate Breeze's relationship with RGS. The evidence supports the trial court's findings.

The City/RGS agreement provided it could be terminated by either party "with or without cause," and also provided the City could request another advisor if they were not satisfied with Breeze's work. Breeze asserts, "The right to cancel the RGS contract is fundamentally different from the right to terminate Breeze's employment," but he fails to explain why this is so. In either event, Breeze would no longer be providing services to the City. We thus agree that, pursuant to the terms of the City/RGS agreement, the City could effectively terminate Breeze's services *with it* if it was not satisfied with his work, either by terminating its contract with RGS or by requesting a different advisor. And the City's right to terminate Breeze's services also gave it " 'the means of controlling [his] activities.' " (*Ayala, supra*, 59 Cal.4th at p. 531.)

Breeze argues the evidence shows the City did not actually exercise control over his work. This may be true, but it is not dispositive because, as noted above, "what matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." (*Ayala, supra*, 59 Cal.4th at p. 533.) " 'If the employer has the authority to exercise . . . control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists.' " (*Tieberg, supra*, 2 Cal.3d at p. 949.) "[I]t is not the control actually exercised, but that which may be exercised which is determinative." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 875.)

We also note that the lack of control actually exercised by the City in this case is easily explained by the fact that the work Breeze performed was typically performed by a

highly skilled employee with extensive experience in public works and with little supervision. Christina Rollins, who manages CalPERS's membership and postretirement employment determination team, testified that because Breeze had extensive experience as a public works director, it was to be expected that he would not require "a lot of oversight" to do the job. And as Breeze testified, he had a master's degree in public administration and almost 27 years of experience in "the public works arena," and the type of work he did for the City was "consistent with" the type of work he did as public works director for other cities before he retired.

Finally, we note Breeze was identified by the City as the interim public works director; the public works director is the head of the public works department; and Breeze testified his job was "to keep the Public Works Department operating" until the City could hire a new public works director. Rickard acknowledged she was ultimately responsible for the work of all City departments, including the public works department, and the City's municipal code states the city manager has the "duty" and "authority to control, order, and give directions to all heads of departments." (Atascadero Mun. Code, § 2-4.08.)[14]

In sum, the evidence is sufficient to support the trial court's conclusion the City had the right to control Breeze's work, even if it rarely, if ever, exercised that right.

b. *The Secondary Factors*

Breeze also challenges several of the trial court's findings regarding the secondary factors. He does not challenge all of them, however, and we will assume any finding that is not challenged is supported by substantial evidence. (See, e.g., *Cameron v. Sacramento County Employees' Retirement System* (2016) 4 Cal.App.5th 1266, 1278 ["factual findings not contested must be accepted as true"].)

---

[14] We grant Breeze's request to judicially notice the Municipal Code.

One of the secondary factors is "the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision." (*Borello, supra*, 48 Cal.3d at p. 351.) As the trial court accurately recognized, "This factor focuses on how the work 'is usually done' in a given locale, not how the work was done in this particular case." (*Vendor Surveillance Corp. v. Henning, supra*, 62 Cal.App.5th at p. 80.) The trial court found the work Breeze did for the City was "usually done under the supervision . . . of a higher-level City employee." Breeze does not directly challenge this finding, and we will thus assume it is supported by substantial evidence. (*Cameron v. Sacramento County Employees' Retirement System, supra*, 4 Cal.App.5th at p. 1278.) Instead, he argues general supervision is insufficient to establish control, because even true independent contractors may be generally supervised.[15] While this may be true, it does nothing to undermine the trial court's finding that the work Breeze did was usually done under the supervision of a City employee.

It is undisputed the work Breeze did was usually performed by the City's public works director, and the public works director is a permanent City employee under the direction and control of the city manager. As noted above, the City's municipal code provides, "It shall be the duty of the City Manager and he or she has the authority to control, order, and give directions to all heads of departments." (Atascadero Mun. Code, § 2-4.08.) As the name implies, the public works director is the head of the public works department, and Breeze performed at least some of the duties of the public works director on an interim basis. The evidence thus establishes the work Breeze did was usually done

---

[15] Here, Breeze appears to conflate the primary factor (i.e., the right to control) with this secondary factor (i.e., whether the work is usually done under the direction of an employer). Whether the City had the right to control Breeze's work is a different question than whether Breeze's work was usually done under the direction of the City.

by a City employee under the direction and control of a higher-level City employee. Although this secondary factor is not dispositive, the trial court's finding that it "weighs in favor of an employee-employer relationship" is supported by the evidence.

The only other secondary factor Breeze addresses is "whether or not the work is a part of the regular business of the principal [here, the City]." (*Borello, supra*, 48 Cal.3d at p. 351.) The trial court found the work Breeze did "fell within the ambit of the City's Public Works Department and would have been performed by the City's Engineer/Public Works Director if the position was not vacant." The trial court thus found this secondary factor weighed in favor of finding an employment relationship, and Breeze tacitly acknowledges this finding is supported by the evidence. He argues, however, that this finding "is insufficient to conclude that he was a common law employee." We agree this finding is not sufficient in and of itself to conclude Breeze was a common law employee, but it is a secondary factor and the trial court did not err in considering it.

Breeze also asserts the trial court treated this factor (i.e., whether the work is a part of the regular business of the City) as "dispositive" or gave it "undue weight." The trial court did not treat this factor as dispositive. Instead, the trial court specifically stated this factor was a "secondary factor" that "weigh[ed] in favor of an employee-employer relationship." Moreover, Breeze fails to convince us the trial court gave this secondary factor undue weight. Again, although this secondary factor is not dispositive, is does weigh in favor of an employment relationship rather than an independent contractor relationship.

In sum, the trial court's findings that the primary factor and three of the secondary factors weigh in favor of an employment relationship are either supported by the evidence or are not challenged by Breeze. Moreover, Breeze does not challenge the trial court's findings that three of the secondary factors are neutral or inapplicable in the facts of this case. Finally, he does not challenge the trial court's finding that the one factor that weighs in favor of an independent contractor relationship—the intent of the parties—is

not sufficient to overcome the other factors. We therefore find the trial court's conclusion that Breeze was a common law employee is supported by substantial evidence.

III

*The Underground Regulations Argument*

Breeze's final argument is that CalPERS's decision was impermissibly based on underground regulations and is thus "ultra vires." We reject this argument as well.

The Administrative Procedure Act (APA) (§ 11340 et seq.) establishes detailed procedural requirements that state agencies must follow when adopting regulations, including providing the public with notice of any proposed regulations, giving interested parties the opportunity to comment thereon, and responding to comments in writing. (§ 11346; see generally §§ 11346.2, 11346.4, 11346.5, 11346.8, 11346.9.) The APA defines the term " 'regulation' " broadly to include "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (§ 11342.600.) A rule subject to the APA thus has two identifying characteristics: (1) "the agency must intend its rule to apply generally, rather than in a specific case"; and (2) "the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 (*Tidewater*).) A rule that meets this definition is a regulation and is subject to the APA even if the agency calls it something different like a "guideline," a "policy," or a "bulletin," and even if it is unwritten. (Cal. Code Regs., tit. 1, § 250, subd. (a) [APA applies to any "guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule" that meets definition of regulation]; *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 336 [policy need not be written in order to be subject to APA because "[w]e decline to endorse an approach that would allow an agency to avoid APA

31

requirements simply by driving its regulations further underground"].)  A regulation that is adopted without following the APA's procedures is known as an "underground regulation" (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 432), and underground regulations are void and may not be used or enforced by the agency (§ 11340.5, subd. (a); *Tidewater*, at p. 572).

Breeze argues that CalPERS is utilizing "unwritten and undefined common law criteria" and/or "[a]n unwritten agency interpretation" of the law.  We presume he contends CalPERS's use of the common law test to determine whether someone is an employee or an independent contractor is improper because it has never adopted a regulation stating it uses that test and identifying the criteria it considers when applying that test.  Assuming this is his argument, we reject it.  CalPERS uses the common law test because our Supreme Court has interpreted the PERL and held it incorporates that test to distinguish employees from independent contractors.  (*Metropolitan, supra*, 32 Cal.4th at p. 496.)  "[A]n agency is mandated to follow the judicial interpretation of a statute." (*Capen v. Shewry* (2007) 155 Cal.App.4th 378, 390.)  CalPERS is thus required to apply the common law test.  Moreover, a long line of California cases explains how to apply the common law test and what factors to consider.  (See, e.g., *Borello, supra*, 48 Cal.3d at p. 350; *Ayala, supra*, 59 Cal.4th at pp. 531-533; *Tieberg, supra*, 2 Cal.3d at p. 949.)  Given this clear legal mandate and authority, CalPERS does not have to promulgate a regulation in order to apply the common law test.

Breeze also complains about CalPERS's use of an "employment relationship questionnaire."  CalPERS uses this questionnaire to obtain information from workers and public agencies in order to help it determine whether a particular worker is a common law employee.  It contains questions like the following:  "How were you hired?"  "To whom do you report?"  "Do you perform services pursuant to a formal job description or duty statement?"  "For the services in question, did the agency provide you with any training?"  "Is your work directed, supervised or reviewed by anyone?"  "Does the

agency have the right to control how you do your work?" And, "Who pays you?" Breeze states the questionnaire "meets the APA's definition of a regulation, and as such, is fundamentally flawed." That is the extent of his argument on this issue. An "appellant must present meaningful legal analysis supported by citations to authority . . . . [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) We need not consider "conclusory claims" (*ibid*.), or claims made without "intelligible legal argument" (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1117), and would thus be well within our right to simply ignore this particular argument.

Even if we were to consider it, we note Breeze cites no legal authority that holds a questionnaire meets the definition of a regulation. The APA expressly states it does not apply to "[a] form prescribed by a state agency or any instructions relating to the use of the form." (§ 11340.9, subd. (c).) Although the term "form" is not defined, we find a questionnaire is analogous to a form (see, e.g., *Tidewater, supra*, 14 Cal.4th at p. 572 [noting with approval that courts have held a checklist used by officers when administering intoxilyzer test is not a regulation]), particularly in the absence of any contrary legal authority from Breeze.

Breeze also asserts—again with no analysis—that the questionnaire fails to define critical terms like "control," "supervision," "reporting," and "training," and is thus "void for vagueness." He fails to explain how the use of undefined terms (that are not particularly vague) makes the questionnaire an underground regulation. The void for vagueness doctrine arises out of the due process clause—not the APA. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 890 ["the underpinning of a vagueness challenge is the due process concept of 'fair warning' "].) "To satisfy due process, a statute must be sufficiently clear to provide adequate notice of the prohibited or required conduct referred to therein. [Citations.] Thus, a statute will be deemed void for vagueness if it either

forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess as to its meaning and differ as to what is required." (*Nisei Farmers League v. Labor & Workforce Development Agency* (2019) 30 Cal.App.5th 997, 1012-1013.) Breeze cites no cases applying the vagueness doctrine to a questionnaire, and he cites no cases holding vague terms can make a questionnaire an underground regulation.

Breeze's final argument is that CalPERS's application of the common law test "is inconsistent and arbitrary," and he asks us to judicially notice three nonprecedential CalPERS decisions that he contends demonstrate this inconsistency. We deny the request because the decisions are not relevant to Breeze's underground regulations argument. In each case the ALJ applied the common law test to the evidence introduced at the administrative hearing, and it is well settled that "interpretations that arise in the course of case-specific adjudication are not regulations." (*Tidewater, supra*, 14 Cal.4th at p. 571; see also *Capen v. Shewry, supra*, 155 Cal.App.4th at p. 387 ["If the interpretation arises in the course of an enforcement proceeding involving the adjudication of a specific case it is not a regulation subject to the APA"].)

Breeze's bigger argument may be that common law test itself can lead to inconsistent and unpredictable results.[16] This may be true. In the words of one court, " 'It is often a very elusive question whether a person under a given state of facts is an [employee] or an independent contractor,' " and "the difference between the two 'is not a line at all but a twilight zone filled with shades of gray." (*Richardson v. APAC-Mississippi* (1994) 631 So.2d 143, 149.) As a result, courts "on quite analogous factual

---

[16] Amici curiae made a similar argument in the *Sandhu* case when they stated the common law test "disincentivize[s]" "experienced retired annuitants and CalPERS contracting agencies . . . from entering into independent contracting agreements" "due to the risk" they will be deemed employees. Breeze asks us to judicially notice the amicus brief and CalPERS asks us to judicially notice its answer thereto, and we grant both requests.

34

situations [have] reached opposite conclusions." (*Ibid*.; see also Carlson, *Why the Law Still Can't Tell an Employee When It Sees One And How It Ought to Stop Trying* (2001) 22 Berkeley J. Emp. & Lab. L. 295, 335 ["However courts state the test of employee status, they routinely concede its failure to produce predictable results for many workers whose status is ambiguous"].) Some inconsistency may be inevitable given that the common law test is a multi-factored test, and case law teaches, " 'the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello, supra*, 48 Cal.3d at p. 351.) Thus, even a slight change in the facts can lead to different results. (See, e.g., *Harger v. Structural Servs., Inc.* (1996) 121 N.M. 657, 667 [916 P.2d 1234, 1334] [" 'Every case presents its own combination of facts, from which the resultant must be arrived at. A fact found controlling in one combination may have a minor importance in another' "].) Indeed, our Supreme Court has noted that some courts and commentators contend one of the "significant disadvantages" of the common law test is the fact "that a multifactor, 'all the circumstances' standard makes it difficult for both hiring businesses and workers to determine in advance how a particular category of workers will be classified, frequently leaving the ultimate employee or independent contractor determination to a subsequent and often considerably delayed judicial decision. In practice, the lack of an easily and consistently applied standard often leaves both businesses and workers in the dark." (*Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 954.) The Legislature is free to amend the PERL to require CalPERS to apply a different and more predictable test, or to provide that workers providing services to public agencies through contracts with third parties like RGS are not employees of the public agencies. Breeze comes close to acknowledging that such a change must come from the Legislature when he states, "there is a need for a statutory exception to the traditional criteria for distinguishing between an employee and an independent contractor" "when a public agency [brings] in someone with specialized skills for short term work." Unless and until the Legislature

amends the PERL, however, we are bound by our Supreme Court's determination that "the PERL requires contracting public agencies to enroll in CalPERS all common law employees" as determined by application of "the established common law test of employment." (*Metropolitan, supra*, 32 Cal.4th at pp. 496, 508.)

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal Rules of Court, rule 8.278(a)(5).)

_____/s/_____
EARL, P. J.

We concur:

_____/s/_____
RENNER, J.

_____/s/_____
FEINBERG, J.